# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF ALABAMA
### Mobile Division

| | |
|---|---|
| SOUTHEASTERN IRONWORKERS ANNUITY PLAN and **LEE BAILEY, STEPHEN BAILEY, WILLIAM MCMILLAN, AND TIMOTHY MILLER**, collectively, as the Board of Trustees of the Southeastern Ironworkers Annuity Plan, | ) ) ) ) ) ) ) ) |
| | ) |
| **Plaintiffs.** | ) |
| | ) |
| v. | ) |
| | ) |
| INVESTMENT PERFORMANCE SERVICES, L.L.C., AMELIA REINERTSEN, and GLOBAL TRUST COMPANY, INC., | ) ) ) ) ) |
| | ) |
| **Defendants.** | ) |

Case No.:

## <u>COMPLAINT</u>

In late 2024, a cyberhacker[1] impersonated the Southeastern Ironworkers Annuity Plan's Administrator. The cyberhacker communicated directly with Amelia Reinertsen, an employee of Investment Performance Services, L.L.C., who then coordinated with Global Trust Company, Inc., to wrongfully transfer millions of dollars in Plan assets to the cyberhacker. This wrongful transfer occurred because

---

[1] The Southeastern Ironworkers Annuity Plan and its Board of Trustees are unaware of the identity of the cyberhacker or the number of individuals involved in the scheme. For convenience, the complaint refers to this person(s) in the singular.

each defendant disregarded the commonly known, understood, and recognized signs of possible phishing and/or lacked the proper cybersecurity awareness protocols, procedures, and training. The Plan and its Board of Trustees commence this action to hold defendants responsible for their failures and to seek redress for the resulting damages to the Plan, its Board of Trustees, and the Plan's beneficiaries for which defendants are liable.

### **PARTIES**

1. Southeastern Ironworkers Annuity Plan (the "Plan") is a pension plan subject to the Employee Retirement Income Security Act of 1974 ("ERISA"). The Plan Administrator is located in Mobile, Alabama.

2. The Plan provides pension benefits to members of Ironworkers Local 798 and Ironworkers Local 709. Ironworkers Local 798 encompasses Mobile, Alabama and the surrounding areas; Ironworkers Local 709 encompasses Savannah, Georgia and the surrounding areas:



3.      The members of these unions include workers that have helped construct projects throughout the region.

4.      The Plan's Board of Trustees currently includes Lee Bailey, Stephen Bailey, William McMillan, and Timothy Miller (collectively, the "Board of Trustees").  Pursuant to ERISA, 29 U.S.C. § 1102(a)(2), the Board of Trustees is a named fiduciary to the Plan.

5.      Defendant Investment Performance Services, L.L.C. ("IPS") is a limited liability company established under the laws of the State of Georgia. IPS contracted with the Board of Trustees to perform "investment consulting services to assist the Trustees in their job of supervising the [Plan]'s investment program."

6.      During all times relevant to this action, Defendant Amelia Reinertsen was employed by IPS as a Senior Client Relations Associate. Upon information and belief, Ms. Reinertsen is a resident of the State of Georgia.

7.      Defendant Global Trust Company ("GTC") is a foreign corporation incorporated in Maine with a principal place of business in Massachusetts. The Plan contracted with GTC to participate in a collective investment and appointed GTC as its investment manager. Pursuant to 29 U.S.C. § 1002(38), GTC is a recognized fiduciary to the Plan under ERISA.

## JURISDICTION AND VENUE

8.     This is a civil action brought pursuant to 29 U.S.C. § 1132(a) and the laws of the States of Alabama and Maine. This Court has original jurisdiction over the Board of Trustees' federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

9.     Venue is proper pursuant to 29 U.S.C. § 1132(e)(2) because the Plan is administered in Mobile, Alabama. Venue is further proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this claim occurred in Mobile, Alabama. Additionally, venue is proper pursuant to 28 U.S.C. § 1391(b)(3) because defendants have availed themselves of the Court's personal jurisdiction by conducting business with the Plan Administrator in Mobile, Alabama.

## GENERAL ALLEGATIONS

10.     Back in 2005, the Board of Trustees contracted with IPS to provide investment consulting services, including: (1) investment manager searches; (2) custodial review and searches; (3) review and revision of the Plan's investment guidelines; (4) quarterly performance monitoring; and (5) presentations of quarterly performance results.

4

11.     Notwithstanding these contractually specified services, IPS and its employees such as Ms. Reinertsen provided additional services to the Plan and the Board of Trustees.

12.     These additional services included, but were not limited to, drafting wiring instructions on the Plan's behalf and coordinating with third parties to facilitate the transfer and investment of the Plan's assets.

13.     IPS has represented to the Plan and its Board of Trustees that such additional services were rendered "as a courtesy" to the Plan and its Board that were not part of its contractual obligations arising from the investment consulting services it provided to the Plan.

14.     In 2020, the Board of Trustees contracted with GTC to participate in a collective investment known as the Barings Collective Investment Trust. Pursuant to that contract, GTC could receive, transfer, and invest the Plan's assets and served as an "investment manager" under ERISA.

15.     In June 2024, the Plan appointed the AFL-AGC Building Trades Benefit Plan as its Plan Administrator and designated Matthew Stringer as an authorized signer for the Plan.

16.     The Plan notified GTC and IPS of the addition of Mr. Stringer as an authorized signer for the Plan by formal letter on or about June 7, 2024.

### I.   Mr. Stringer executes the Original Transaction Form.

17.   In September 2024, the AFL-AGC Building Trades Benefit Plan decided to execute a full redemption of the Plan's investment in GTC's Barings Collective Investment Trust.

18.   On or about September 19, 2024, Mr. Stringer notified GTC and Ms. Reinertsen of the intended redemption and provided GTC and Ms. Reinertsen with an executed transaction form (the "Original Transaction Form").

19.   The Original Transaction Form directed GTC to complete the redemption by September 27, 2024.

20.   The Original Transaction Form directed GTC to wire the Plan's assets to a bank account at Truist Bank.

### II.   A cyberhacker compromises Mr. Stringer's email account.

21.   Mr. Stringer's email account was infiltrated by a cyberhacker.

22.   Thereafter, the cyberhacker began to communicate with Ms. Reinertsen, IPS, and GTC, purporting to be Mr. Stringer.

23.   There were several evident differences between email correspondence from Mr. Stringer and email correspondence from the cyberhacker.

24.   For example, at times, the cyberhacker's version of Mr. Stringer's email signature did not include the AFL-AGC Building Trades Benefit Plan's logo:

| Real Mr. Stringer Signature: | Cyberhacker Signature: |
|---|---|



(highlighting added).

25.    As shown above, at times, the cyberhacker's email signature also contained a phone number that differed from the real Mr. Stringer's contact number (which was the publicly available phone number for the AFL-AGC Building Trades Benefit Plan).

26.    At times, emails from the cyberhacker also contained typographic errors such as improper noun-verb agreement; seemingly missing nouns, prepositions, or other words; random capitalizations; and other like errors:



(highlighting added).

7

27.    At times, the emails from the cyberhacker also prompted the receiving party's computer system to insert warning labels that the messages "contain[ed] suspicious characteristics:"

This Message contains suspicious characteristics and has originated outside your organization.

Hi Amelia,

(highlighting added).

28.    These errors and differences were visible to the average person and are commonly known, understood, and recognized signs of phishing.

29.    In addition, these errors and differences are identified in contemporaneous governmental guidance as warning signs or strong indicators of phishing attacks. As a few examples:

a. Guidance from the Employee Benefits Security Administration warns that "[c]ommon warning sign[] of phishing attacks include[s] . . . [s]pelling errors or poor grammar."[2]

b. Guidance from the Department of Homeland Security's Cybersecurity & Infrastructure Security Agency warns that "[p]oor grammar and

---

[2] The Employee Benefits Security Administration's online security tips were published in conjunction with Administration's September 6, 2024 Cybersecurity Guidance Update. *See* U.S. Dep't of Labor, Emp. Benefits Sec. Admin., Online Security Tips, *published in Cybersecurity Guidance Update Compliance Assistance Release No. 2024-01* (Sept. 6, 2024), https://www.dol.gov/agencies/ebsa/employers-and-advisers/plan-administration-and-compliance/compliance-assistance-releases/2024-01.

sentence structure, misspellings, and inconsistent formatting are other indicators of a possible phishing attempt."[3]

30.    In short, the cyberhacker's emails contained the signs of possible phishing based on commonly known, understood, and recognized indicators; industry standards; and other accepted standards like the governmental guidance described above.

31.    Yet Ms. Reinertsen, IPS, and GTC failed to detect, disregarded, or otherwise ignored these signs of phishing in the cyberhacker's email correspondence. Even worse, they facilitated the phishing scheme.

### III.    The cyberhacker executes Fraudulent Transaction Form No. 1.

32.    On or about September 24, 2024, the cyberhacker informed Ms. Reinertsen of a "new checking account number" to use in the previously scheduled redemption of the Plan's investment in GTC's Barings Collective Investment Trust.

33.    Sudden changes to wiring instructions made solely by email are commonly known, understood, and recognized signs of phishing.

34.    In addition, contemporaneous governmental guidance encourages recipients of changes to financial information to "[c]onfirm a message is legitimate

---

[3] U.S. Dep't of Homeland Sec., Cybersecurity & Infrastructure Security Agency, *Avoiding Social Engineering and Phishing Attacks* (Feb. 1, 2021), https://www.cisa.gov/news-events/news/avoiding-social-engineering-and-phishing-attacks.

by contacting the sender (it is best to look up the sender's contact information yourself instead of using contact information in the message)."[4]

35.    Upon information and belief, Ms. Reinertsen did not attempt to verbally verify this sudden change in checking account number.

36.    Upon information and belief, no one else at IPS attempted to verbally verify this sudden change in checking account number.

37.    Alternatively, if IPS and Ms. Reinertsen attempted to verify the sudden change in account number through the number in the cyberhacker's email signature, this attempt would have been ineffective because the cyberhacker's email signature contained a phone number that differed from the real Mr. Stringer's contact number (which was the publicly available phone number for the AFL-AGC Building Trades Benefit Plan).

38.    IPS and Ms. Reinertsen failed to detect, disregarded, or otherwise ignored this commonly known, understood, and recognized sign of possible phishing in the cyberhacker's email correspondence of September 24, 2024.

39.    Ms. Reinertsen instead provided the cyberhacker with the Original Transaction Form and instructed the cyberhacker to revise the Original Transaction Form accordingly.

---

[4]    Federal Deposit Insurance Corporation, *Cybersecurity* (last updated Mar. 19, 2024), https://www.fdic.gov/consumer-resource-center/cybersecurity#.

40.    Later that day, the cyberhacker provided Ms. Reinertsen with a revised transaction form ("Fraudulent Transaction Form No. 1"), which directed GTC to wire the Plan's assets to an account associated with First Merchants Bank, a different bank than the one identified on the Original Transaction Form.

41.    The email transmitting Fraudulent Transaction Form No. 1 contained typographic errors such as random capitalizations. In addition, the email transmitting Fraudulent Transaction Form No. 1 did not contain the AFL-AGC Building Trades Benefit Plan's logo and contained a phone number that differed from the publicly available phone number for the AFL-AGC Building Trades Benefit Plan):



(highlighting added).

42.    Unlike the Original Transaction Form, Fraudulent Transaction Form No. 1 was unsigned.

11

43.    As detailed above, at the time the cyberhacker provided Fraudulent Transaction Form No. 1 to Ms. Reinertsen and IPS, typographic errors and inconsistent formatting were warning signs of a phishing attempt based on commonly known, understood, and recognized indicators; industry standards; and other accepted standards like the governmental guidance described herein.

44.    IPS and Ms. Reinertsen failed to detect, disregarded, or otherwise ignored these commonly known, understood, and recognized signs of phishing in the subsequent September 24, 2024 correspondence related to Fraudulent Transaction Form No. 1.

45.    On or about September 25, 2025, Ms. Reinertsen asked the cyberhacker to perform a confirmation call related to Fraudulent Transaction Form No. 1.

46.    The cyberhacker informed Ms. Reinertsen that he was suddenly "out of town for a family emergency" and would be available only by email.

47.    The cyberhacker further indicated that "Mary"—an otherwise unidentified individual associated with the cyberhacker—would call Ms. Reinertsen to verify the wring instructions:

> See the attached letter, which includes Intercontinental in the header. Mary tried to call you yesterday, but it seems you left the office. She will follow up with the confirmation call as soon as she's back in the office. I'm going out of town for a family emergency, but I will be active on my email, so if you need anything, let me know.

(highlighting added).

48.    An individual's sudden unavailability and insistence on only email communications are commonly known, understood, and recognized signs of phishing.

49.    In addition, contemporaneous, publicly available governmental guidance warns that a "[c]ommon warning sign[] of phishing attacks include[s] . . . great urgency."[5]

50.    Further, a proper confirmation call requires that party sending a wire call an authorized representative of the recipient to verify the wiring instructions, **_not_** the other way around as proposed by the cyberhacker to Ms. Reinertsen—yet another warning sign of a phishing attempt based on commonly known, understood, and recognized indicators; industry standards; and other accepted standards like the governmental guidance referenced above.

51.    IPS and Ms. Reinertsen failed to detect, disregarded, or otherwise ignored the commonly known, understood, and recognized signs of phishing in the September 25, 2024 correspondence related to performing a confirmation call for Fraudulent Transaction Form No. 1.

---

[5] *See* U.S. Dep't of Labor, Emp. Benefits Sec. Admin., Online Security Tips *published in Cybersecurity Guidance Update Compliance Assistance Release No. 2024-01* (Sept. 6, 2024), https://www.dol.gov/agencies/ebsa/employers-and-advisers/plan-administration-and-compliance/compliance-assistance-releases/2024-01.

52.     Instead, Ms. Reinertsen directly transmitted Fraudulent Transaction Form No. 1 to GTC.

53.     Upon information and belief, neither Ms. Reinertsen nor IPS attempted to perform a confirmation call to verbally verify the change in Fraudulent Transaction Form No. 1 before sending it to GTC.

54.     Upon information and belief, GTC did not perform a confirmation call to verbally verify the change in Fraudulent Transaction Form No. 1 after receiving it from Ms. Reinertsen.

55.     Alternatively, if Ms. Reinertsen, IPS, or GTC attempted to verify the instructions in Fraudulent Transaction Form No. 1 through the number in the cyberhacker's email signature or the method proposed by the cyberhacker, this attempt would have been ineffective because:

    a. The cyberhacker's email signature contained a phone number that differed from the real Mr. Stringer's contact number (and which was the publicly available phone number for the AFL-AGC Building Trades Benefit Plan);

    b. A verification by receiving a call from "Mary" is not a proper confirmation call procedure; and/or

    c. "Mary" was not authorized to approve transactions on behalf of the Plan.

14

56.     Later that day (September 25, 2024), Ms. Reinertsen asked the cyberhacker to sign Fraudulent Transaction Form No. 1.

57.     When the cyberhacker returned a signed version of Fraudulent Transaction Form No. 1, the cyberhacker's version of Mr. Stringer's signature did not match the signature in the Original Transaction Form; the formatting was unusual, indicating that the signature was likely copied from the Original Transaction Form that Ms. Reinertsen provided to the cyberhacker:

**Signature for Original Transaction Form**

(Client Authorized Signature Required)

**Signature for Fraudulent Transaction Form No. 1**

(Client Authorized Signature Required)

58.     As detailed above, inconsistent formatting is a commonly known, understood, and recognized sign of phishing.

59.    In addition, governmental guidance warns that "inconsistent formatting" is an "indicator[] of a possible phishing attempt."[6]

60.    So, the signed Fraudulent Transaction Form No. 1 contained yet another warning sign of a phishing attempt based on commonly known, understood, and recognized indicators; industry standards; and other accepted standards like the governmental guidance described herein.

61.    IPS and Ms. Reinertsen failed to detect, disregarded, or otherwise ignored the commonly known, understood, and recognized signs of phishing in the signed Fraudulent Transaction Form No. 1.

62.    Upon information and belief, despite this further indication of a phishing attempt, Ms. Reinertsen did not perform a confirmation call to verbally verify the change in wiring instructions after receiving the signed Fraudulent Transaction Form No. 1.

63.    Upon information and belief, no one else from IPS performed a confirmation call to verbally confirm the wiring instructions in the signed Fraudulent Transaction Form No. 1.

64.    Instead, Ms. Reinertsen provided the signed Fraudulent Transaction Form No. 1 to GTC.

---

[6] U.S. Dep't of Homeland Sec., Cybersecurity & Infrastructure Security Agency, *Avoiding Social Engineering and Phishing Attacks* (Feb. 1, 2021), https://www.cisa.gov/news-events/news/avoiding-social-engineering-and-phishing-attacks.

65. GTC also failed to detect, disregarded, or otherwise ignored the commonly known, understood, and recognized signs of possible phishing in the signed Fraudulent Transaction Form No. 1.

66. Upon information and belief, despite the indications of phishing, GTC did not verbally verify the change in wiring instructions contained in signed Fraudulent Transaction Form No. 1.

67. Alternatively, if Ms. Reinertsen, IPS, or GTC attempted to verify the instructions in signed Fraudulent Transaction Form No. 1 through the number in the cyberhacker's email signature or the method proposed by the cyberhacker, this attempt would have been ineffective because:

   a. The cyberhacker's email signature contained a phone number that differed from the real Mr. Stringer's contact number (which was the publicly available phone number for the AFL-AGC Building Trades Benefit Plan);

   b. A verification by receiving a call from "Mary" is not a proper confirmation call procedure; and/or

   c. "Mary" was not authorized to approve transactions on behalf of the Plan.

## IV.   Fraudulent Transaction Form No. 1's wiring instructions are rejected.

68.   Between September 26 and September 27, 2024, GTC attempted to effectuate the full redemption of the Plan's investment in the Barings Collective Investment Trust.

69.   On or about September 27, 2024, GTC's bank notified GTC that the wire was "kicked back" because the receiving bank was unable to process the transfer due to a "name and ac[7] mismatch."

70.   Mismatched wiring instructions are a commonly known, understood, and recognized sign of phishing.

71.   GTC failed to detect, disregarded, or otherwise ignored the commonly known, understood, and recognized sign of phishing evidenced by the mismatched wiring instructions.

72.   Upon information and belief, GTC also did not attempt to verbally confirm the wiring instructions after receiving the kick back from its bank.

73.   Instead, representatives from GTC forwarded the kick back to Ms. Reinertsen and IPS and requested that Ms. Reinertsen confirm the wiring instructions.

---

[7] "Ac" is believed to be an acronym or shorthand for "account," referring to the account at the receiving bank.

18

74. Ms. Reinertsen and IPS similarly failed to detect, disregarded, or otherwise ignored the commonly known, understood, and recognized sign of phishing evidenced by the mismatched wiring instructions.

75. Upon information and belief, Ms. Reinertsen did not attempt to verbally confirm the wiring instructions after receiving the kick back as requested by GTC.

76. Upon information and belief, no one else from IPS attempted to verbally confirm the wiring instructions after receiving the kick back notification.

77. Alternatively, if Ms. Reinertsen, IPS, or GTC attempted to verify the instructions after receiving the kickback through the number in the cyberhacker's email signature or the prior method proposed by the cyberhacker, this attempt would have been ineffective because:

 a. The cyberhacker's email signature contained a phone number that differed from the real Mr. Stringer's contact number (which was the publicly available phone number for the AFL-AGC Building Trades Benefit Plan);

 b. A verification by receiving a call from "Mary" is not a proper confirmation call procedure; and/or

 c. "Mary" was not authorized to approve transactions on behalf of the Plan.

## V.    The cyberhacker executes Fraudulent Transaction Form No. 2.

78.    Upon information and belief, on or about September 30, 2024, the cyberhacker executed a second revised transaction form ("Fraudulent Transaction Form No. 2"), which directed GTC to wire the Plan's assets to an account at Citibank, yet another, different bank from both the Original Transaction Form and Fraudulent Transaction Form No. 1.

79.    As described above, sudden changes to wiring instructions made solely by email are a commonly known, understood, and recognized sign of phishing.

80.    Such an indicator of phishing is particularly strong when—as was the case here—wiring instructions had already been rejected by one bank and the revised instructions contemplated a transfer to a new, different bank.

81.    Ms. Reinertsen, IPS, and GTC failed to detect, disregarded, or otherwise ignored the recognized commonly known, understood, and recognized signs of phishing in Fraudulent Transaction Form No. 2.

82.    Upon information and belief, Ms. Reinertsen did not attempt to verbally confirm the wiring instructions in Fraudulent Transaction Form No. 2.

83.    Upon information and belief, no one else from IPS attempted to verbally confirm the wiring instructions in Fraudulent Transaction Form No. 2.

84.    Upon information and belief, GTC also did not attempt to verbally confirm the wiring instructions in Fraudulent Transaction Form No. 2.

85.    Alternatively, if Ms. Reinertsen, IPS, or GTC attempted to verify the instructions in Fraudulent Transaction Form No. 2 through the number in the cyberhacker's email signature or the prior method proposed by the cyberhacker, this attempt would have been ineffective because:

   a.  The cyberhacker's email signature contained a phone number that differed from the real Mr. Stringer's contact number (which was the publicly available phone number for the AFL-AGC Building Trades Benefit Plan) and/or

   b.  Upon information and belief, Ms. Reinertsen, IPS, and/or GTC had not performed the confirmation call properly and/or performed such call with an individual who was not authorized to act on behalf of the Plan.

86.    GTC instructed its bank to wire the funds to Citibank pursuant to the instructions in Fraudulent Transaction Form No. 2.

87.    Unfortunately, this transfer was successful. GTC's bank transferred $2,572,707.74 of the Plan's assets to a bank account unaffiliated with the Plan.

## VI.    The Plan investigated the wrongful transfer.

88.    After this wrongful transfer occurred, the Plan and its Board of Trustees investigated the circumstances surrounding the transfer and attempted to recover the missing funds.

21

89.    During this investigation, Citibank was notified of the phishing, and Citibank purportedly contained the wired funds.

90.    Upon information and belief, in either late 2024 or early 2025, Citibank informed GTC that $618,122.14 was "the only amount that was recoverable."

91.    In January 2025, GTC informed IPS that $618,122.14 was "all that will be returned."

92.    GTC also confirmed that GTC "d[id] not perform a callback" confirmation call before effectuating the change in wiring instructions and wire transfer:

> Please confirm if GTC completed a callback to update the wiring instructions to Citibank. If so, please provide details on the callback.
> GTC requires that an individual on the authorized signers list directed the wire instruction update.  GTC would confirm the individual has authority before changing wire instructions. We do not perform a callback.

(red text provided by GTC).

93.    Approximately $1,954,585.60 of the Plan's funds remains unaccounted for.

## VII.    <u>**The wrongful transfer occurred because of defendants' failures.**</u>

94.    Ms. Reinertsen, IPS, and GTC each failed to detect, disregarded, and/or otherwise ignored the commonly known, understood, and recognized signs of phishing including, but not limited to, in:

a.  The typographic errors and inconsistencies in the email correspondence with the cyberhacker;

b.  The warning labels of "suspicious characteristics" in email correspondence with the cyberhacker;

c.  The email correspondence specifically related to Fraudulent Transaction Form No. 1;

d.  The email correspondence related to performing a confirmation call for Fraudulent Transaction Form No. 1;

e.  The circumstances surrounding the signature of Fraudulent Transaction Form No. 1;

f.  The kickback notification of Fraudulent Transaction Form No. 1;

g.  The email correspondence specifically related to Fraudulent Transaction Form No. 2;

h.  The change of bank in Fraudulent Transaction Form No. 2; and/or

i.  Other correspondence and interactions with the cyberhacker or persons connected to the cyberhacker as discovery may reveal.

95.  IPS and GTC each failed to maintain protocols and procedures for detecting and investigating phishing activities consistent with industry standards, including by:

a. Failing to train employees on the commonly known, understood, and recognized signs of phishing;

b. Failing to train employees on the procedures for a proper confirmation call procedures;

c. Failing to require employees to examine correspondence for commonly known, understood, and recognized signs of phishing;

d. Failing to require employees to perform confirmation call procedures; and/or

e. Other defects in procedures, training, and protocol as discovery may reveal.

96. In advance of the wrongful transfer and as detailed above, multiple governmental agencies published guidance and best practices for detection of phishing.

97. That guidance uniformly warned entities that strong indicators of phishing include but are not limited to: (1) poor grammar, sentence structure, and misspellings; (2) inconsistent formatting; and (3) false sense of great urgency.

98. To combat possible phishing schemes, the government guidance recommendations include but are not limited to: (1) having a formal, well

24

documented cybersecurity program and (2) conducting periodic cybersecurity awareness training.[8]

99.    The government guidance further advises that a "***prudently designed***" cybersecurity program will "[d]etect and respond to cybersecurity events" and should contain "[f]ormal and effective policies and procedures" on, among other things, "[c]ybersecurity awareness training, which is [to be] given to all personnel annually."[9]

100.    The guidance also explains that "[s]ince identity theft is a leading cause of fraudulent distributions, it should be considered a key topic of [employee] training, which should focus on current trends to exploit unauthorized access to systems. Be on the lookout for individuals falsely posing as authorized plan officials, fiduciaries, participants or beneficiaries."[10]

---

[8] *See, e.g.*, U.S. Dep't of Labor, Emp. Benefits Sec. Admin., Cybersecurity Program Best Practices *published in Cybersecurity Guidance Update Compliance Assistance Release No. 2024-01* (Sept. 6, 2024), https://www.dol.gov/agencies/ebsa/employers-and-advisers/plan-administration-and-compliance/compliance-assistance-releases/2024-01.

[9] U.S. Dep't of Labor, Emp. Benefits Sec. Admin., Cybersecurity Program Best Practices *published in Cybersecurity Guidance Update Compliance Assistance Release No. 2024-01* (Sept. 6, 2024), https://www.dol.gov/agencies/ebsa/employers-and-advisers/plan-administration-and-compliance/compliance-assistance-releases/2024-01 (emphasis added).

[10] U.S. Dep't of Labor, Emp. Benefits Sec. Admin., Cybersecurity Program Best Practices *published in Cybersecurity Guidance Update Compliance Assistance Release No. 2024-01* (Sept. 6, 2024), https://www.dol.gov/agencies/ebsa/employers-and-advisers/plan-administration-and-compliance/compliance-assistance-releases/2024-01.

101. In addition to their failures to maintain training, procedures, and protocol in accordance with common expectations and industry standards, IPS and GTC each failed to follow these governmental recommendations by, among other things, failing to maintain a prudently designed cybersecurity program and/or failing to conduct cybersecurity awareness training.

102. Upon information and belief, IPS failed to educate Ms. Reinertsen regarding, among other topics, the possibility that for individuals may falsely pose as authorized plan officials.

103. Upon information and belief, IPS knew that Ms. Reinertsen lacked the requisite training, skills, and techniques necessary to identify cybersecurity threats yet continued to allow Ms. Reinertsen to process transactions, communicate with third parties on behalf of the Plan and assist in the management of Plan assets.

104. Independently and collectively, the failures of Ms. Reinertsen, IPS, and GTC enabled the cyberhacker(s) to successfully transfer the Plan's assets.

105. The transfer of the Plan's assets was contrary to the expressed intentions of the Plan and its Board of Trustees.

106. The Plan and its Board of Trustees have been unable to recover portions of the transferred funds and thus has been deprived of their ability to control such funds and to manage those funds.

107.   Participants in the Plan have likewise been deprived of their interest in the transferred funds.

## FIRST CAUSE OF ACTION
*Wantonness under Alabama law*
*Against IPS*

108.   This claim is asserted by the Plan on its own behalf and by the Plan and its Board of Trustees on behalf of the Plan's participants.  The Plan and the Board of Trustees incorporates by reference the allegations in paragraphs 9 through 107 as if fully set out herein.

109.   IPS has represented to the Plan and its Board of Trustees that IPS performed extracontractual "courtesy services" to the Plan, its Board of Trustees, and/or the Plan's participants.

110.   In performance of those services, IPS acted with a reckless or conscious disregard of the interests of the Plan, its Board of Trustees, and the Plan's participants by failing to maintain proper procedures and protocols for cybersecurity awareness.

111.   Because of IPS's recklessness and/or conscious disregard, the Plan and its Board of Trustees have been unable to recover portions of the transferred funds and thus has been deprived of their ability to control and manage those funds.

112.   Because of IPS's recklessness and/or conscious disregard, participants in the Plan have likewise been deprived of their interest in the transferred funds.

27

113. As a result, the Plan, its Board of Trustees, and the Plan's participants have suffered damages.

## SECOND CAUSE OF ACTION
*Wantonness under Alabama law*
*Against Amelia Reinertsen*

114. This claim is asserted by the Plan on its own behalf and by the Plan and its Board of Trustees on behalf of the Plan's participants. The Plan and the Board of Trustees incorporates by reference the allegations in paragraphs 9 through 107 as if fully set out herein.

115. According to IPS, Ms. Reinertsen performed extracontractual "courtesy services" to the Plan, its Board of Trustees, and the Plan's participants.

116. In performance of those services, Ms. Reinertsen acted with a reckless or conscious disregard of the interests of the Plan, its Board of Trustees, and/or the Plan's participants by, among other things:

    a. Ignoring or failing to identify the commonly known, understood, and recognized signs of possible phishing in correspondence with the cyberhacker and/or persons associated with the cyberhacker;

    b. Deliberately failing to perform a verbal callback for wiring instructions with any authorized signer for the Plan and/or intentionally relying upon an ineffective verbal representation from "Mary";

28

    c.  Deliberately ignoring the notification of invalid wiring instructions; and/or

    d.  Other conduct as discovery may reveal.

117. Because of Ms. Reinertsen's recklessness and/or conscious disregard, the Plan and its Board of Trustees have been unable to recover portions of the transferred funds and thus has been deprived of their ability to control such funds and to manage those funds.

118. Because of Ms. Reinertsen's recklessness and/or conscious disregard, participants in the Plan have likewise been deprived of their interest in the transferred funds.

119. As a result, the Plan, its Board of Trustees, and the Plan's participants have suffered damages.

**THIRD CAUSE OF ACTION**
*Vicarious Liability under Alabama law*
*Against IPS for Ms. Reinertsen's Wantonness*

120. This claim is asserted by the Plan on its own behalf and by the Plan and its Board of Trustees on behalf of the Plan's participants. The Plan and the Board of Trustees incorporates by reference the allegations in paragraphs 9 through 107 as if fully set out herein.

29

121. Ms. Reinertsen performed certain "courtesy services" with a reckless or conscious disregard of the interests of the Plan, its Board of Trustees, and/or the Plan's participants.

122. Ms. Reinertsen performed these wanton acts in the line and scope of her employment with IPS and/or in her role as a Senior Client Relations Associate.

123. Ms. Reinertsen performed these wanton acts in the furtherance of IPS's business in providing investment consulting services.

124. IPS participated, authorized, or ratified Ms. Reinertsen's wanton acts by, among other things:

    a. Failing to require Ms. Reinertsen to examine correspondence for commonly known, understood, and recognized signs of possible phishing;

    b. Failing to require Ms. Reinertsen to perform callback verification procedures for wiring instructions and/or allowing Ms. Reinertsen to utilize ineffective callback procedures; and/or

    c. Other conduct as discovery may reveal.

125. Because of Ms. Reinertsen's wanton acts, the Plan and its Board of Trustees have been unable to recover portions of the transferred funds and thus has been deprived of their ability to control such funds and to manage those funds.

126. Because of Ms. Reinertsen's wanton acts, participants in the Plan have likewise been deprived of their interest in the transferred funds.

127. As a result, the Plan, its Board of Trustees, and the Plan's participants have suffered damages.

### FOURTH CAUSE OF ACTION
*Negligence under Alabama law*
*Against Amelia Reinertsen*

128. This claim is asserted by the Plan on its own behalf and by the Plan and its Board of Trustees on behalf of the Plan's participants. The Plan and the Board of Trustees incorporates by reference the allegations in paragraphs 9 through 107 as if fully set out herein.

129. According to IPS, Ms. Reinertsen performed extracontractual "courtesy services" to the Plan, its Board of Trustees, and the Plan's participants.

130. In performance of these voluntary, courtesy services, Ms. Reinertsen owed the Plan, its Board of Trustees, and the Plan's participants a duty to act with due care.

131. Ms. Reinertsen failed to perform these services with due care, by among other things:

    a. Ignoring or failing to identify the commonly known, understood, and recognized signs of possible phishing in correspondence with the cyberhacker and/or persons associated with the cyberhacker;

b. Ignoring or failing to perform security verification procedures for wiring instructions;

c. Continuing to coordinate the transfer of Plan assets after receiving notification of invalid wiring instructions; and/or

d. Other conduct as discovery may reveal.

132. Because of Ms. Reinertsen's failure to exercise due care, the Plan and its Board of Trustees have been unable to recover portions of the transferred funds and thus has been deprived of their ability to control and manage those funds.

133. Because of Ms. Reinertsen's failure to exercise due care, participants in the Plan have likewise been deprived of their interest in the transferred funds.

134. As a result, the Plan, its Board of Trustees, and the Plan's participants have suffered damages.

## FIFTH CAUSE OF ACTION
*Vicarious Liability under Alabama law*
*Against IPS for Ms. Reinertsen's Negligence*

135. This claim is asserted by the Plan on its own behalf and by the Plan and its Board of Trustees on behalf of the Plan's participants. The Plan and the Board of Trustees incorporates by reference the allegations in paragraphs 9 through 107 as if fully set out herein.

136. Ms. Reinertsen failed to perform "courtesy services" in accordance with due care.

137. Ms. Reinertsen performed these negligent acts in the line and scope of her employment with IPS and/or in her role as a Senior Client Relations Associate.

138. Ms. Reinertsen performed these negligent acts in the furtherance of IPS's business in providing investment consulting services.

139. IPS participated, authorized, or ratified Ms. Reinertsen's negligent acts by, among other things:

    a. Failing to require Ms. Reinertsen to examine correspondence for commonly known, understood, and recognized signs of phishing;

    b. Failing to require Ms. Reinertsen to perform callback verification procedures for wiring instructions and/or allowing Ms. Reinertsen to utilize ineffective callback procedures; and/or

    c. Other conduct as discovery may reveal.

140. Because of Ms. Reinertsen's negligent acts, the Plan and its Board of Trustees have been unable to recover portions of the transferred funds and thus has been deprived of their ability to control such funds and to manage those funds.

141. Because of Ms. Reinertsen's negligent acts, participants in the Plan have likewise been deprived of their interest in the transferred funds.

142. As a result, the Plan, its Board of Trustees, and the Plan's participants have suffered damages.

### SIXTH CAUSE OF ACTION
*Wanton Supervision or Training under Alabama law*

*Against IPS*

143. This claim is asserted by the Plan on its own behalf and the Board of Trustees on behalf of the Plan's participants. The Plan and the Board of Trustees incorporates by reference the allegations in paragraphs 9 through 107 as if fully set out herein.

144. As detailed above, Ms. Reinertsen lacked competency in, among other things:

    a. Cybersecurity awareness;

    b. Detection of commonly known, understood, and recognized signs of possible phishing;

    c. Procedures for verification of wiring instructions; and/or

    d. Other areas as discovery may reveal.

145. Upon information and belief, IPS knew of Ms. Reinertsen's lack of competency in these topics because, among other reasons, IPS failed to:

    a. Provide Ms. Reinertsen with the proper cybersecurity awareness training;

    b. Maintain proper protocols and procedures for identifying phishing attempts;

    c. Provide follow-up supervision to ensure any procedures were being adequately followed; and/or

34

d.  Other conduct as discovery may reveal.

146.  IPS recklessly and/or consciously disregarded Ms. Reinertsen's lack of training and supervision by continuing to allow Ms. Reinertsen to process transactions, communicate with third parties on behalf of the Plan, and assist in the management of Plan assets.

147.  Because of IPS's recklessness and/or conscious disregard, the Plan and its Board of Trustees have been unable to recover portions of the transferred funds and thus has been deprived of their ability to control such funds and to manage those funds.

148.  Because of IPS's recklessness and/or conscious disregard, participants in the Plan have likewise been deprived of their interest in the transferred funds. As a result, the Plan, its Board of Trustees, and the Plan's participants have suffered damages.

**<u>SEVENTH CAUSE OF ACTION</u>**
*Breach of Fiduciary Duty under ERISA*
*Against IPS and Amelia Reinertsen*

149.  In the alternative to the foregoing state law claims against IPS and Ms. Reinertsen, this claim is asserted by the Board of Trustees, as fiduciaries to the Plan, pursuant to ERISA, 29 U.S.C. § 1132(a)(2). The Board of Trustees incorporates by reference the allegations in paragraphs 9 through 107 as if fully set out herein.

35

150. Under ERISA, 29 U.S.C. § 1002(21)(A), an entity or individual is the fiduciary of an employee benefit plan to the extent the entity or individual (i) exercises discretionary authority or control over plan management or any authority or control over management or disposition of plan assets, (ii) renders advice regarding plan assets for a fee or other compensation or has authority or responsibility to do so, or (iii) has any discretionary authority or responsibility in plan administration.

151. IPS and Ms. Reinertsen were fiduciaries to the Plan because, among other reasons, they had control over management and disposition of the Plan's assets. Further, IPS offered advice regarding plan assets for a fee, including but not limited to how to fill out transfer forms.

152. Under ERISA, 29 U.S.C. § 1104(a), a fiduciary must act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent [person] acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

153. IPS and Ms. Reinertsen breached their fiduciary duties to act with care, skill, prudence, and diligence by failing to:

    a. Maintain proper procedures and protocols for cybersecurity awareness;

    b. Maintain proper procedures and protocols for wiring instruction verification procedures;

36

c. Ensure that any such procedures and protocols for cybersecurity awareness were followed;

d. Ensure that any such procedures and protocols for verification of wiring instructions were followed;

d. Exercise authority or control over the disposition of the Plan's assets in a manner consistent with that of a prudent person acting in a like capacity and familiar with such matters; and/or

e. Other conduct as discovery may reveal.

154. Under ERISA, 29 U.S.C. § 1109(a), "[a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach."

155. By virtue of breaching their fiduciary duties, Ms. Reinertsen and IPS are liable to the Board of Trustees on behalf of the Plan for (i) losses resulting from their breach, (ii) reasonable attorneys' fees incurred to remedy these breaches, and (iii) any other equitable or remedial relief deemed appropriate by this Court.

## EIGHTH CAUSE OF ACTION
*Breach of Fiduciary Duty under ERISA*
*Against GTC*

156.   This claim is asserted by the Board of Trustees, as fiduciaries to the Plan, pursuant to ERISA, 29 U.S.C. § 1132(a)(2). The Board of Trustees incorporates by reference the allegations in paragraphs 9 through 107 as if fully set out herein.

157.   Under ERISA, 29 U.S.C. § 1002(38), an investment manager is a fiduciary "who has the power to manage, acquire, or dispose of any asset of a plan," has satisfied various registration requirements, and "has acknowledged in writing that he is a fiduciary with respect to the plan."

158.   Under ERISA, 29 U.S.C. § 1002(21)(A), an entity or individual is the fiduciary of an employee benefit plan to the extent the entity or individual (i) exercises discretionary authority or control over plan management or any authority or control over management or disposition of plan assets, (ii) renders advice regarding plan assets for a fee or other compensation or has authority or responsibility to do so, or (iii) has any discretionary authority or responsibility in plan administration.

159.   As an investment manager and pursuant to its written agreement with the Plan, GTC was a fiduciary to the plan. GTC also had control over disposition of the Plan's assets and directed the transfer of the Plan's assets.

160. Under ERISA, 29 U.S.C. § 1104(a), a fiduciary must act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent [person] acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

161. GTC breached its fiduciary duties to act with due care, skill, prudence, and diligence by failing to:

a. Maintain proper procedures and protocols for cybersecurity awareness;

b. Have any procedures and protocols for wiring instruction verification procedures;

c. Ensure that any such procedures and protocols for cybersecurity awareness were followed;

d. Manage the disposition of the Plan's assets in a manner consistent with that of a prudent person acting in a like capacity and familiar with such matters; and/or

e. Other conduct as discovery may reveal.

162. Under ERISA, 29 U.S.C. § 1109(a), "[a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach."

39

163. By virtue of breaching its fiduciary duties, GTC is liable to the Board of Trustees on behalf of the Plan for (i) losses resulting from their breach, (ii) reasonable attorneys' fees incurred to remedy these breaches, and (iii) any other equitable or remedial relief deemed appropriate by this Court.

**NINTH CAUSE OF ACTION**
*Conversion under Maine Law*
*Against GTC*

164. This claim is asserted by the Plan on its own behalf and by the Plan and the Board of Trustees on behalf of the Plan's participants. Pursuant to the Participation Agreement with GTC, this claim is asserted under Maine Law. The Board and the Plan asserts this claim as an alternative to its prior ERISA claim against GTC. The Plan and the Board of Trustees incorporates by reference the allegations in paragraphs 9 through 107 as if fully set out herein.

165. GTC intentionally interfered with the Plan's assets, without lawful justification, by:

    a. Exercising dominion and control over the Plan's assets in a manner inconsistent with the rights of the Plan, its Board of Trustees, and/or the Plan's participants;

    b. Diverting the Plan's assets in a manner inconsistent with the intent of the Plan, its Board of Trustees, and/or the Plan's participants; and/or

    c. Other conduct as discovery may reveal.

40

166.   Because of GTC's conduct, the Plan and its Board of Trustees have been unable to recover portions of the transferred funds and thus have been deprived of their ability to control such funds and to manage those funds.

167.   Because of GTC's conduct, participants in the Plan have likewise been deprived of their interest in the transferred funds.

168.   As a result, the Plan, its Board of Trustees, and the Plan's participants have suffered damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request damages and judgment against Defendants, jointly and severally, for the counts set forth above as follows:

1.   For compensatory damages in the approximately amount of $1,954,585.60 and any interest on these funds that would have been earned had such funds been invested according to the Plan and its Board of Trustees' intent, plus legal interest, pursuant to Alabama law, Maine law, and/or 29 U.S.C. § 1109(a).

2.   For the Plaintiffs' reasonable costs, expenses, and attorneys' fees incurred by them in prosecuting this action to the extent available under Alabama law, Maine law, and/or 29 U.S.C. § 1132(g)(1).

3.   For such other relief this Court deems fair and just under the circumstances.

## JURY TRIAL DEMAND

Plaintiffs hereby demand a jury trial of all issues so triable.

Respectfully submitted March 24, 2026.

/s/ Alexander G. Thrasher
Alexander G. Thrasher (Ala. Bar No. 1716-M46N)
Katelyn E. Carson (Ala. Bar No. 8084-N31Z)
BRADLEY ARANT BOULT CUMMINGS LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, Alabama 35203
Telephone: (205) 521-8000
athrasher@bradley.com
kcarson@bradley.com

## CERTIFICATE OF SERVICE

I hereby certify that on March 24, 2026, I provided a copy of such filing to the following via certified mail:


IPS
c/o Jacquie Crean
570 E York Street
Savannah, GA, 31401

Amelia Reinertsen
124 Blueleaf Court
Savannah, GA 31410

Amelia Reinertsen
604 Ryan Lane
Pooler, GA 31322

Global Trust Company
c/o Registered Agent Solutions, Inc.
One Canal Plaza
Ninth Floor
Portland, ME 04112